**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION**
Case No.:  5:17-CV-423


HAWORTH, INC., a Michigan corporation,

        Plaintiff,

v

BETTY B. OLSEN, an individual, BARBARA
O. WHITMAN, an individual, BETTYE J.
SHEPARD,  an  individual,  SHIRISHA
JANUMPALLY,  M.D.,  an  individual,
SILVIJA VALLERU, D.D.S., an individual,
SURESH  VENKAT  DOKI,  an  individual,
LIONSHEAD            ENTERPRISES
CORPORATION,  a  Delaware  corporation,
GLOBAL COMPUTER PRODUCTS, INC., a
Virginia  corporation,  FEDERAL  SYSTEMS,
LLC, a Virginia limited liability company, and
GIBRALTAR BUSINESS CAPITAL, LLC, a
Delaware  limited  liability  company,  SHOP
TOOLS,  INC.,  a  Colorado  corporation,
WILLIAM  INMAN  COMPANY,  LLC,  a
Florida     limited     liability     company,
ATTRACTCAPITAL LLC, a New York
limited liability company,

        Defendants.
_____/

**COMPLAINT**

     Plaintiff Haworth, Inc. ("**Haworth**"), by its attorneys, brings this Complaint against

Defendants Betty B. Olsen ("**Betty Olsen**"), Barbara O. Whitman ("**Whitman**"), Bettye J.

Shepard ("**Shepard**"), Shirisha Janumpally, M.D. ("**Janumpally**"), Silvija Valleru, D.D.S.

("**Valleru**"), Suresh Venkat Doki ("**Doki**"), Lionshead Enterprises Corporation ("**Lionshead**"),

Global Computer Products, Inc. ("**Global**"), Federal Systems, LLC ("**Federal Systems**"),

Gibraltar Business Capital, LLC ("**Gibraltar**"), Shop Tools, Inc. ("**Shop Tools**"), William

Inman Company, LLC ("**Inman Company**"), and AttractCapital LLC ("**AttractCapital**"), stating as follows:

## PARTIES AND JURISDICTION

1.      Plaintiff Haworth is a Michigan corporation having its registered office at One Haworth Center, Holland, Michigan 49423.

2.      Defendant Betty Olsen is an individual residing at 1829 Senate Street Apartment 15E, Columbia, South Carolina, 29201, who previously served as a director of Miller's of Columbia, Inc. ("**Miller's**"), a North Carolina closely-held corporation.

3.      Defendant Whitman is an individual residing at 244 Royal Lythan Circle, Lexington, South Carolina, 29072, who previously served as a director of Miller's.

4.      Defendant Shepard is an individual residing at 1985 Riviera Drive, Suite 103, Mount Pleasant, South Carolina, 29464, who previously held shares in Miller's.

5.      Defendant Janumpally is an individual residing at 4902 Finchem Court, Fairfax, Virginia, 22030, who served as an officer and, upon information and belief, a director of Miller's.

6.      Defendant Valleru is an individual residing at 6206 Colchester Road, Fairfax, Virginia, 22030, who served as an officer and, upon information and belief, a director of Miller's.

7.      Defendant Doki is an individual residing at 1013 Founders Ridge, McLean, Virginia, 22102, who acted on behalf of Janumpally and Valleru to control Miller's.

8.      Defendant Lionshead is a Delaware corporation whose registered agent has an address of 1209 Orange Street, Wilmington, Delaware, 19801. Lionshead was retained by Janumpally and Valleru to manage Miller's.

2

9.	Defendant Global is a Virginia corporation having its principal office at 4451 Brookfield Corp. Drive, Suite 117, Chantilly, Virginia, 20151.

10.	Defendant Federal Systems is a Virginia limited liability company having its principal office at 4902 Finchem Court, Fairfax, Virginia, 22030.

11.	Defendant Gibraltar is a Delaware limited liability company having its principal office at 400 North Skokie Boulevard, Northbrook, Illinois, 60062.

12.	Defendant Shop Tools, Inc. is a Colorado corporation having its principal office at 1110 Elkton Drive, Unit A, Colorado Springs, Colorado, 80907.

13.	Defendant Inman Company is a Florida limited liability company whose registered agent's address is 4977 River Point Road, Jacksonville, Florida, 32207.

14.	Defendant AttractCapital is a New York limited liability company having an office at 16 Brandywine Drive, East Setauket, New York, 11733.

15.	The Court has subject matter jurisdiction under 28 U.S.C. §§ 1332 because Plaintiff is diverse from each Defendant, and the amount in controversy exceeds $75,000.

16.	Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this district. Miller's is a closely-held corporation organized and existing in North Carolina, and the individual Defendants were officers, directors, shareholders and/or individuals in control of Miller's. Further, the fraudulent transfers alleged in this complaint damaged and were harmful to Miller's, a North Carolina corporation, and its creditors.

# FACTUAL BACKGROUND

*Introduction*

17.     Haworth is a global leader in the design and manufacture of organic workspaces, including seating products, systems furniture, raised floors, movable walls, and storage systems.

18.     This complaint arises out of indebtedness owed by Miller's of Columbia, Inc. ("**Miller's**") to Haworth.  Although Miller's primary place of business is (or was) in South Carolina, Miller's was organized in 1967 as a North Carolina corporation.  Miller's remains an active North Carolina corporation as of the date of this complaint and lists its registered agent as CT Corporation, 160 Mine Lake Ct., Suite 200, Raleigh, North Carolina 27615 in the 2016 Annual Report filed on February 28, 2017.

19.     Miller's was previously an authorized Haworth dealer and had been so for decades.  While it was a Haworth dealer, Miller's sold Haworth products to customers in South Carolina, North Carolina and other states.

20.     Miller's was founded in 1967 by Wallace J. Olsen, Sr., who passed away in 2004.  Upon information and belief, Miller's was owned solely by descendants of Mr. Olsen until the LBO Transaction (as defined below) occurred in 2016.

*Miller's of Columbia, Inc.'s Indebtedness to Haworth*

21.     On December 18, 2007, Haworth and Miller's entered into a Dealer Agreement (the "**Dealer Agreement**").   Miller's was a Haworth dealer prior to that date pursuant to other agreements with Haworth.

22.     The Dealer Agreement authorized Miller's to sell Haworth products and otherwise governed the relationship between Miller's and Haworth.

23.     Throughout 2015 and 2016, Plaintiff sold to Miller's certain Haworth and other products described in invoices sent to Miller's (the "**Products**").

24.     Plaintiff invoiced Miller's for the Products sold to Miller's.

25.     Miller's promised to pay Plaintiff for the Products.

26.     Miller's failed and refused to pay the amount due and owing for purchase of the Products.

27.     Under the terms of the Dealer Agreement, in the event Miller's failed to pay the amount due for the Products, Miller's agreed to pay Plaintiff one and one-half percent for each month or 18% per annum that the payment owed for the Products was not paid.

28.     As of August 15, 2017, Miller's is indebted to Haworth in the amount of $1,285,163.77, consisting of $1,155,267.39 in past due unpaid invoices and $129,896.37 in unpaid finance charges.

29.     In December 2016, Haworth commenced a lawsuit against Miller's in the Kent County Circuit Court in Grand Rapids, Michigan, seeking payment of the indebtedness owing to Haworth.  This ongoing litigation also includes claims against Paul and David Olsen on a guaranty they executed, guaranteeing Miller's indebtedness to Haworth, and a claim for piercing the corporate veil against Janumpally and Valleru.  This litigation is ongoing.

30.     Miller's is not included as a defendant in this Complaint because the litigation against Miller's in Michigan is ongoing. Haworth requires permission to dismiss Miller's as a defendant in the Michigan lawsuit, but plans to do so and to subsequently add Miller's as a defendant in this litigation.  Further, the Michigan litigation includes a claim against Janumpally and Valleru for piercing the corporate veil, which Haworth will assert in this action when Janumpally and Valleru have been dismissed (without prejudice) from the Michigan litigation.

5

*The Leveraged Buyout Transaction*

31.     At all times during January 2016, Miller's was owned by Betty Olsen, Whitman, Shepard (collectively, the "**Cashed-Out Sellers**"), Paul Olsen and David Olsen.

32.     Betty Olsen, Whitman, Shepard, and David Olsen were directors of Miller's at all times during January 2016.

33.     In February of 2016, Janumpally and Valleru (collectively, the "**New Owners**"), Doki, and Lionshead (collectively with the New Owners, the "**Controlling Group**") undertook to purchase a controlling interest in Miller's through the New Owners, pursuant to a leveraged buyout transaction (the "**LBO Transaction**").

34.     As explained below, the LBO Transaction simultaneously drained Miller's of cash and loaded it with debt.

35.     To effect the LBO Transaction, Miller's, David Olsen, the Cashed-Out Sellers, and the New Owners entered into a Stock Redemption and Purchase Agreement dated February 19, 2016 (the "**Agreement**").

36.     Under the Agreement, Miller's redeemed its shares from the Cashed-Out Sellers and David Olsen in exchange for $1,000,000.00 cash and a promissory note in the amount of $1,650,000.00.

37.     Under the Agreement, David Olsen retained some shares in Miller's, but all shares held by the Cashed-Out Sellers were redeemed.

38.     Although the Agreement was dated February 19, 2016, the LBO Transaction was funded on March 2, 2016.

39.     Upon information and belief, of the $1,000,000 in cash paid for the redemption of Miller's shares pursuant to the LBO Transaction, Whitman received a gross total of $309,300.00,

from which $108,225.00 for a portion of Inman Company's $350,000.000 fee and $66,423.00 for payoff of a loan was deducted.

40.     Upon information and belief, of the $1,000,000.00 in cash paid for the redemption of Miller's shares, Betty Olsen received a gross total of $454,600.00, from which $159,110.00 for a portion of Inman Company's fee and $97,627.00 for payoff of a loan was deducted.

41.     Upon information and belief, of the $1,000,000.00 in cash paid for the redemption of Miller's shares, Shepard received a gross total of $68,700.00, from which $24,045.00 was deducted for a portion of Inman Company's fee.

42.     Of the $1,000,000.00 in cash paid for the redemption of Miller's shares, upon information and belief, Miller's paid $350,000.00 to Inman Company.

43.     Of the $1,000,000.00 in cash paid for the redemption of Miller's shares, upon information and belief, Miller's paid $70,000.00 to AttractCapital.

44.     Betty Olsen and Whitman, as directors of Miller's prior to the closing of the LBO Transaction, authorized Miller's to redeem its shares and otherwise enter into the Agreement.

45.     Under the Agreement, upon information and belief, the New Owners collectively paid approximately $586,000.00 to Miller's in exchange for a 70% controlling interest in Miller's.

46.     Janumpally owned 56% of Miller's and Valleru owned 14% of Miller's following the closing of the LBO Transaction.

47.     Miller's remaining shares were held by Paul and David Olsen following the closing of the LBO Transaction.

*The New Owners Delegate All Management to Doki and Lionshead*

48.    After the closing of the LBO Transaction, the New Owners entirely abdicated their responsibilities as controlling owners and officers and failed to take any management role in Miller's whatsoever.

49.    Although the New Owners held a 70% controlling interest in Miller's after the closing of the LBO Transaction, they did not devote their full-time attention to running the company.

50.    Despite the Buyer's failure to participate in Miller's business affairs, they nevertheless became the Chief Executive Officer (Janumpally) and President (Valleru) of Miller's.

51.    Janumpally is a neurologist who resides in Virginia.

52.    Valleru is a dentist who also resides in Virginia.

53.    Both the New Owners continued their practices on a full-time basis in Virginia, and never moved to South Carolina to take any management role in Miller's.

54.    Upon information and belief, the New Owners were also directors of Miller's.

55.    Instead of the New Owners managing the company themselves, Doki and Lionshead, on behalf of the New Owners, took over complete management and control of Miller's.

56.    Doki and Lionshead are also located in Virginia, rather than South Carolina, and remained in Virginia while attempting to manage Miller's remotely.

57.    The New Owners themselves took little or no action on their own behalf with respect to management of Miller's, instead exclusively acting through Doki and Lionshead.

58. After the closing of the LBO Transaction, the Controlling Group took full control over Miller's bank accounts and had exclusive check-writing authority for Miller's.

59. The Controlling Group caused Miller's to agree to pay Lionshead the exorbitant management fee of $20,000 per month.

60. Miller's paid this management fee on several occasions during a period that Miller's was not paying Haworth or its other vendors.

***Miller's Is Unable to Pay Its Debts as They Became Due***

61. After the closing of the LBO Transaction, Miller's financial situation suddenly and dramatically declined.

62. Prior to the closing of the LBO Transaction, Haworth was told that the transaction would strengthen Miller's financial situation.

63. In fact, the LBO Transaction drained cash from Miller's that Miller's needed to meet its obligations and saddled Miller's with $1,650,000.00 in additional debt.

64. Miller's began having difficulty paying its vendors, including Haworth, as soon as March 9, 2016 – only days after the March 2, 2016 funding date of the LBO Transaction.

65. Miller's was in such dire financial straits in the spring of 2016 that it was unable to meet its payroll obligations and needed cash in order to meet payroll.

66. Miller's cash crunch immediately following the closing of the LBO Transaction was caused in part by the decision of the Controlling Group to change Miller's primary source of operating capital.

67. Prior to the closing of the LBO Transaction, Miller's obtained working capital through a traditional line of credit with Synovus Bank.

PPAB 3842769v1

68.     Post-closing, the New Owners and the Controlling Group caused Miller's to replace that traditional line of credit with a factoring arrangement through a factoring company, Bayview Funding (the "**Factoring Facility**").

69.     The Factoring Facility negatively impacted Miller's working capital by removing Miller's ability to pledge its inventory to secure its line of credit.

70.     The interest rate on the Factoring Facility was also substantially higher than Miller's previous bank line of credit.

71.     With the change to the Factoring Facility, Miller's ability to borrow was reduced by hundreds of thousands of dollars.

72.     As a result of the reduced credit availability and higher interest rates, Miller's lacked the financial ability to pay trade creditors like Haworth as early as the beginning of March 2016.

### *Doki and Lionshead Fraudulently Induce Haworth to Ship Orders*

73.     In June 2016, Miller's had fallen behind on its account with Haworth.

74.     A major customer of Miller's had various outstanding orders with Haworth.

75.     To induce Haworth to make shipments for the customer's orders, Doki (on behalf of himself and Lionshead) promised and represented to Haworth that he would forward payments received from the customer to Haworth each day as they were received.

76.     In reliance on the promises and representations of Doki and Lionshead, Haworth shipped $142,000.00 in orders.

77.     Rather than Miller's forwarding payments as they were received from the customer, Miller's received only a few payments.

78.     Of the $142,000.00 in orders shipped, $87,378.00 remains unpaid.

PPAB 3842769v1

79.     Doki (on behalf of himself and Lionshead) intentionally made these false representations to induce Haworth to ship products.

80.     Upon information and belief, Doki and Lionshead had no intention of forwarding payments from the customer as they were received at the time they made such representation to Haworth.

81.     Upon information and belief, Doki and Lionshead made other intentional, false representations to Haworth in order to induce Haworth to ship products, despite Miller's delinquent account with Haworth.

***The Controlling Group Withdraws Funds from Miller's***

82.     After the consummation of the LBO Transaction, the Controlling Group took complete control of Miller's bank accounts.

83.     Upon information and belief, the Controlling Group proceeded to freely move funds between Miller's and Global, Federal Systems, Gibraltar, Shop Tools (collectively, the "**Affiliated Entities**") and Lionshead.

84.     The Affiliated Entities have no ostensible business relationship with Miller's.

85.     The Controlling Group, through Lionshead and the Affiliated Entities, provided $240,000.00 to Miller's, and directly paid one of Miller's vendors in the amount of approximately $395,000.00 (collectively, the "**Cash Contributions**").

86.     The Controlling Group has characterized the Cash Contributions as loans, but in reality the Cash Contributions were equity contributions because the Cash Contributions were not documented as loans, were given at a time when Miller's was unable to pay its debts as they became due and were otherwise in the nature of equity.

87.     Despite Miller's desperate need for cash, the Controlling Group caused $790,349.78 to be transferred from Miller's to Lionshead, the other members of the Controlling Group and/or the Affiliated Entities between the closing of the LBO Transaction and November 29, 2016 (collectively, the "**Withdrawals**").

88.     The Cash Contributions were capital contributions, which were improperly withdrawn in violation of the rights of Miller's creditors, including Haworth.

### The Controlling Group Diverts Miller's Funds from Haworth

89.     On September 26, 2016, Haworth sent a letter to Miller's demanding payment of $1,326,403.75 owed to Haworth.

90.     After that demand, Haworth, the Controlling Group and Paul and David Olsen engaged in discussions about arrangements for repayment of the amounts owed to Haworth.

91.     However, those discussions were ultimately unsuccessful.

92.     Accordingly, on November 10, 2016, Haworth renewed its prior demand for payment via email to Paul and David Olsen and the Controlling Group.

93.     Haworth demanded a repayment plan or full payment by November 21, 2016.

94.     On November 29, 2016, Doki told Paul Olsen that the New Owners planned to withdraw $541,000.00 from Miller's rather than using Miller's funds to make payment to Haworth.

95.     The Controlling Group caused Miller's to transfer $320,000.00 to Lionshead the same day.

96.     In December 2016, Paul and David Olsen exercised their rights under a stock pledge agreement related to the LBO Transaction to retake the 70% of Miller's stock that was acquired by the New Owners.

97.    As of December 2016, Miller's was no longer a Haworth dealer.

## COUNT I - FRAUDULENT TRANSFER UNDER N.C.G.S. § 39-23.5(b)
### (Recovery of insider preferences; Claim for recovery against the Controlling Group and the Affiliated Entities)

98.    Haworth incorporates the preceding paragraphs as if fully restated here.

99.    After the closing of the LBO Transaction, from August 2016 through November 2016, the Controlling Group caused hundreds of thousands of dollars to be transferred from Miller's to Lionshead and the Affiliated Entities.  Such transfers totaled not less than $545,770.00.

100.    Miller's indebtedness to Haworth arose before August 2016.

101.    The Controlling Group was in control of Miller's at the time of the transfers.

102.    The Affiliated Entities are affiliates of the Controlling Group.

103.    The transfers were made for antecedent debts.

104.    From August 2016 through November of 2016, Miller's was not paying its debts as they became due.

105.    Upon information and belief, from August 2016 to November 2016, at a fair valuation, the sum of Miller's debts was greater than the sum of Miller's assets.

106.    The Controlling Group and the Affiliated Entities had reasonable cause to believe that Miller's was insolvent from April through November of 2016.

107.    The transfers from Miller's to Lionshead and the Affiliated Entities are voidable as to Haworth under N.C.G.S. § 39-23.5(b).

PPAB 3842769v1

## COUNT II - FRAUDULENT TRANSFER UNDER N.C.G.S. § 39-23.1(a)(1)
### (Actual fraud; Claim for recovery against the Controlling Group)

108.    Haworth incorporates the preceding paragraphs as if fully restated here.

109.    On November 29, 2016, the Controlling Group caused $320,000.00 to be transferred from Miller's to Lionshead (the "**November 29 Transfer**").

110.    The November 29 Transfer was made shortly after Haworth informed the Controlling Group that it planned to pursue Miller's for the amounts owed to Haworth.

111.    The November 29 Transfer was made to Lionshead, who was in control of Miller's at the time of the November 29 Transfer.

112.    At the time of the November 29 Transfer, Miller's was not paying its debts as they became due.

113.    Upon information and belief, at the time of the November 29 Transfer, at a fair valuation, the sum of Miller's debts was greater than the sum of Miller's assets.

114.    Miller's did not receive reasonably equivalent value, or any value, in exchange for the November 29 Transfer.

115.    The November 29 Transfer was made with actual intent to defraud Miller's creditors, including Haworth.

116.    The November 29 Transfer from Miller's to the Controlling Group was fraudulent under N.C.G.S. § 39-23.4(a)(1) as to Haworth.

117.    Upon information and belief, the Controlling Group made additional transfers to Lionshead and the Affiliated Entities with actual intent to defraud its creditors, including Haworth.

PPAB 3842769v1

## COUNT III - FRAUDULENT TRANSFER UNDER N.C.G.S. § 39-23.4(a)(2)
### (Constructive fraud; Claim for recovery against the
### Controlling Group and the Affiliated Entities)

118.    Haworth incorporates the preceding paragraphs as if fully restated here.

119.    From April 2016 to November 2016, the Controlling Group caused hundreds of thousands of dollars to be transferred from Miller's to the Controlling Group and the Affiliated Entities.  The transfers totaled not less than $790,349.78.

120.    Miller's indebtedness to Haworth arose before April 2016.

121.    Miller's did not receive reasonably equivalent value in exchange for the transfers to the Controlling Group and the Affiliated Entities.

122.    From April 2016 through November of 2016, Miller's was not paying its debts as they became due.

123.    Upon information and belief, from April 2016 to November 2016, at a fair valuation, the sum of Miller's debts was greater than the sum of Miller's assets.

124.    The transfers of money from Miller's to the Controlling Group and the Affiliated Entities were fraudulent under N.C.G.S. § 39-23.4(a)(2) as to Haworth.

## COUNT IV – FRAUD/MISREPRESENTATION
### (as against Doki and Lionshead)

125.    Haworth incorporates the preceding paragraphs as if fully restated here.

126.    In June 2016, Doki and Lionshead represented to Haworth they would forward payments to Haworth at the time the payments were received from the customer.

127.    The representations of Doki and Lionshead were made for the purpose of inducing Haworth to ship the customer's outstanding orders and Haworth relied on the representations.

PPAB 3842769v1

128. At the time Doki and Lionshead made the false representations, Doki and Lionshead did not intend to forward payments to Haworth at the time the payments were received from the customer.

129. The false representations made by Doki and Lionshead caused Haworth damages in an amount not less than $87,378.00.

130. Upon information and belief, Doki and Lionshead made other intentional, false representations for the purpose of inducing Haworth to ship products.

## COUNT V - BREACH OF FIDUCUARY DUTY
### (Claim for recovery against the Controlling Group)

131. Haworth incorporates its allegations contained in the preceding paragraphs.

132. Miller's was insolvent beginning as of February 19, 2016 and continuing at all times thereafter.

133. Beginning as of February 19, 2016 and continuing at all times thereafter, Miller's was unable to pay its vendors.

134. Beginning as of February 19, 2016 and continuing at all times thereafter, Miller's was being pursued by creditors, including Haworth.

135. Under N.C.G.S. § 55-8-42, an officer of a corporation has a duty to undertake his or her duties in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances; and in a manner he or she reasonably believes to be in the best interests of the corporation.

136. As officers of Miller's, the New Owners owed a fiduciary duty to its creditors given that Miller's was insolvent, unable to pay its debts as they became due and/or in the vicinity of insolvency.

PPAB 3842769v1

137.    The New Owners improperly and illegally delegated their responsibilities for managing Miller's to Doki and Lionshead.

138.    The Controlling Group breached their fiduciary duties to Miller's in various ways, including, without limitation:

    A.    The New Owners improperly and illegally attempting to delegate their fiduciary duty to Lionhead and Doki and taking no active management role in Miller's despite being CEO and President of the company;

    B.    Gross mismanagement, including replacing Miller's bank line of credit with the much more expensive Factoring Facility, resulting in severely reduced cash flow to Miller's; and

    C.    Withdrawing hundreds of thousands of dollars in capital contributions during Miller's insolvency.

## COUNT VI - DECLARATORY JUDGMENT
### (as against the Controlling Group and the Affiliated Entities)

139.    Haworth incorporates its allegations contained in the preceding paragraphs.

140.    An actual and ongoing controversy exists between Haworth, the Controlling Group, and the Affiliated Entities concerning whether the Cash Contributions were capital contributions or loans.

141.    Haworth asserts that the Cash Contributions are equity contributions for the reasons stated earlier in this Complaint.

142.    A declaratory judgment from this Court will resolve the controversy as to whether the Cash Contributions were capital contributions or loans.

143.    Under N.C.G.S. § 26-1-253, Haworth is entitled to a judgment declaring that:

A.     All Cash Contributions made by the Controlling Group and the Affiliated Entities from April 2016 through November 2016 were capital contributions; and

B.     No Cash Contributions from the Controlling Group or the Affiliated Entities to Miller's from April 2016 through November 2016 constituted loans or indebtedness to the Controlling Group or the Affiliated Entities.

## COUNT VII - UNLAWFUL REDEMPTION OF STOCK UNDER N.C.G.S. § 55-6-40(c)
### (Unlawful distributions related to LBO Transaction, as against Betty Olsen and Whitman)

144.     Haworth incorporates the preceding paragraphs as if fully restated here.

145.     Under N.C.G.S. § 55-6-40, no distribution of corporate funds may be made to shareholders if, after giving effect to the distribution, the corporation will not be able to pay its debts as they come due in the usual course of business.

146.     Under N.C.G.S. § 55-8-33(a), a director who votes for or assents to an improper distribution is personally liable for the amount of the distribution that exceeds what could have been distributed without violating N.C.G.S. § 55-6-40.

147.     Prior to the consummation of the LBO Transaction, Betty Olsen and Whitman served as directors of Miller's.

148.     Betty Olsen and Whitman authorized the redemption of a portion of Miller's shares in exchange for $1,000,000.00 cash and a promissory note in the amount of $1,650,000.00 in favor of the Cashed-Out Sellers.

149.     After the consummation of the LBO Transaction, Miller's was unable to pay its debts as they came due in the usual course of business.

150.     As a result, Betty Olsen and Whitman are personally liable for the $1,000,000.00 they authorized as distributions pursuant to the LBO Transaction.

## COUNT VIII - FRAUDULENT TRANSFER UNDER N.C.G.S. § 39-23.4(a)(2)
### (Constructive fraud as against the Cashed-Out Sellers, Inman Company, and AttractCapital resulting from the LBO Transaction)

151.    Haworth incorporates the preceding paragraphs as if fully restated here.

152.    As part of the LBO Transaction, Miller's redeemed the stock owned by the Cashed-Out Sellers, along with the stock owned by David Olsen.

153.    Upon information and belief, Inman Company acted as a broker with respect to the LBO Transaction.

154.    AttractCapital, upon information and belief, acted as a business advisor with respect to the LBO Transaction.

155.    Miller's paid an aggregate $1,000,000.00 to the Cashed-Out Sellers, David Olsen, Inman Company, and AttractCapital for the redeemed shares.

156.    Miller's did not receive reasonably equivalent value in exchange for the transfer of $1,000,000.00 to the Cashed-Out Sellers, David Olsen, Inman Company, and AttractCapital.

157.    As a result of the LBO Transaction, Miller's remaining assets became unreasonably small in relation to its business.

158.    After the LBO Transaction, Miller's was unable to pay its debts as they became due.

159.    Miller's indebtedness to Haworth arose before March 2016.

160.    The transfers of money from Miller's to the Cashed-Out Sellers and David Olsen were fraudulent under N.C.G.S. § 39-23.4(a)(2) as to Haworth.

161.    Upon information and belief, Inman Company, in addition to receiving funds from Miller's, participated in effecting the fraudulent transfers to the Cashed-Out Sellers and David Olsen.

162.     AttractCapital, upon information and belief, in addition to receiving funds from Miller's, participated in the fraudulent transfers to the Cashed-Out Sellers and David Olsen.

163.     AttractCapital, upon information and belief, in addition to receiving funds from Miller's, aided and abetted the fraudulent transfers to the Cashed-Out Sellers and David Olsen.

164.     Whitman, Betty Olsen, Shepard, Inman Company and AttractCapital are liable for the amounts received from Miller's.

WHEREFORE, Haworth respectfully requests that the Court:

A.     Enter judgment in favor of Haworth and against the Controlling Group and the Affiliated Entities, jointly and severally, under Count I in an amount not less than $545,770.00;

B.     Enter judgment in favor of Haworth and against the Controlling Group, jointly and severally, under Count II in an amount not less than $320,000.00;

C.     Enter judgment in favor of Haworth and against the Controlling Group and the Affiliated Entities, jointly and severally, under Count III in an amount not less than $790,349.78

D.     Enter judgment in favor of Haworth and against Doki and Lionshead, jointly and severally, under Count IV in an amount not less than $87,378.00;

E.     Enter judgment in favor of Haworth and against the Controlling Group, jointly and severally, under Count V in the amount of $1,285,163.77, consisting of $1,155,267.39 in past due unpaid invoices and $129,896.37, plus applicable finance charges accruing after August 15, 2017, at the rate of one and one half percent per month;

F.     Enter judgment under Count VI declaring that (a) all Cash Contributions made by the Controlling Group and the Affiliated Entities from April 2016 through November 2016 were capital contributions; and (b) no Cash Contributions from the Controlling Group or the Affiliated

PPAB 3842769v1

Entities to Miller's from April 2016 through November 2016 constituted loans or indebtedness to the Controlling Group or the Affiliated Entities;

G.     Enter judgment in favor of Haworth and against Betty Olsen and Whitman, jointly and severally, under Count VII in an amount not less than $1,000,000.00;

H.     Enter judgment in favor of Haworth and against Whitman under Count VIII in an amount not less than $309,300.00;

I.     Enter judgment in favor of Haworth and against Betty Olsen under Count VIII in an amount not less than $454,600.00;

J.     Enter judgment in favor of Haworth and against Shepard under Count VIII in an amount not less than $68,700.00;

K.     Enter judgment in favor of Haworth and against Inman Company under Count VIII in an amount not less than $350,000.00;

L.     Enter judgment in favor of Haworth and against AttractCapital under Count VIII in an amount not less than $70,000.00;

M.     Award Haworth its attorneys' fees and costs, to the extent permitted by law; and

N.     Grant such other and further relief as the Court deems just and proper.

This the 18th day of August, 2017.

*/s/ Brian D. Darer*
Brian D. Darer
N.C. Bar No. 25383
PARKER POE ADAMS & BERNSTEIN LLP
301 Fayetteville Street, Suite 1400
P.O. Box 389
Raleigh, NC 27602
Telephone: (919) 835-4624
Facsimile: (919) 834-4564

and

Gordon J. Toering
Emily S. Rucker
CM/ECF Notices forthcoming
WARNER NORCROSS & JUDD LLP
900 Fifth Third Center
111 Lyon Street NW
Grand Rapids, MI 49503-2487
Telephone: (616) 752-2000
gtoering@wnj.com
erucker@wnj.com

*Attorneys for Plaintiff Haworth, Inc.*

PPAB 3842769v1